IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
Philadelphia Division


MICHELE A. CHRISTIAN, an individual, *pro se*,
and as Wife and Husband,

   *Plaintiff,*

and

GEORGE H. CHRISTIAN, an individual, *pro se*,
and as Wife and Husband,

   *Plaintiff,*

v.

FULTON FINANCIAL CORPORATION,
DEMANDED
WELLS FARGO, N.A., US BANK NATIONAL
ASSOCIATION as Trustee for CSMC
Mortgage Backed Pass-through Certificates,
Series 2006-5; MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.(MERS1);
MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.(MERS2); SAMUEL I. WHITE, P.C.;
JOHN DOE AND JANE DOES Unknown purported
notary, and other individuals yet to be determined,
if any, also involved in the loan transaction and other
claims in this case; ABC CORPORATIONS
Corporations, Partnerships, LLCs, entities yet to be
determined, if any, also involved in the loan
transaction and other claims in this case,

RESOURCE BANK,
One Penn Square
Lancaster, PA 17604

RESOURCE MORTGAGE,
One Penn Square
Lancaster, PA 17604

WELLS FARGO HOME MORTGAGE, INC.,

WELLS FARGO FUNDING, INC.

Case No.: cv10:000789

JURY TRIAL

1

US BANCORP

US BANK NATIONAL ASSOCIATION
60 Livingston Avenue
St. Paul, MN  55051

CMSC MORTGAGE BACKED PASS-THROUGH
CERTIFICATES, SERIES 2006-5
9062 Old Annapolis Road
Columbia MD 21045

CREDIT SUISSE FIRST BOSTON
MORTGAGE SECURITIES CORP.
11 Madison Ave
New York, NY  10010

CREDIT SUISSE SECURITIES (USA) LLC

CREDIT SUISSE MANAGEMENT, LLC

CREDIT SUISSE HOLDINGS (USA), INC.
Depository trust company, a New York
Limited purpose trust company

AMERICA'S SERVICING COMPANY

ROBERT BELL, in his individual and
Professional capacity,

REAL ESTATE INVESTMENT
PROTECTION AGENCY,

CLEARSTREAM,

EUROCLEAR SYSTEM,

EUROCLEAR BANK S.A./ N.V,

EUROCLEAR SYSTEM CLEARANCE
SYSTEMS S.C. A Belgium Co-Operative
Corporation,

**DLJ MORTGAGE CAPITAL, INC.**
A Delaware Corporation
11 Madison Ave
New York, NY 10010,

**AMERICAN HOME MORTGAGE CORP.,**

**COUNTRYWIDE HOME LOANS SERVICING LP**
A Texas Limited Partnership
7105 Corporate Drive
Plano, TX 75024,

**COUNTRYWIDE GP, INC.**
A Nevada Corporation,

**COUNTRYWIDE LP, INC.**
A Nevada Corporation,

**COUNTRYWIDE HOME LOANS**
A New York Corporation
4500 Park Granada
Calabasas, CA 91302,

**CITIBANK, As depositary for Clearstream,**
Luxemberg, and JP Morgan Chase, NA
Depositary for Euroclear

**CEDE & CO.**
Holder of Record DTC Registered Certificates

**COUNTRYWIDE SERVICING,**

**COUNTRYWIDE FINANCIAL CORPORATION**
A Delaware Corporation,

**SELECT PORTFOLIO SERVICING, INC.**
A Utah Corporation
3815 South West Temple
Salt Lake City, UT 84115,

**CREDIT SUISSE FINANCIAL CORPORATION**
A Delaware Coporation
302 Carnegie Center, 2nd Floor
Princeton, NJ 08540,

**BANK OF AMERICA, N.A.,**

**COUNTRYWIDE HOME LOANS SERVICING,**

**CHAYTOR MIDGETTE**
**750 VOLVO PARKWAY**
**CHESAPEAKE, VA 23320**

**JOHN ABAD**
**4429 BONNEY ROAD**
**VIRGINIA BEACH, VA 23462**

        *Defendants.*

## FIRST AMENDED COMPLAINT

1.      Plaintiff Michele A. Christian, *pro se*, an individual, ("Mrs. Christian") and Plaintiff George H. Christian, *pro se*, an individual ("Mr. Christian") and collectively as Wife and Husband, (the "Christians" or the "Plaintiffs") hereby file their First Amended Complaint as of right by filing it within 21 days of the Defendants Rule 12(b) Motion to Dismiss. Alternatively, request leave of Court.

2.      This action arises from certain transactions surrounding a fraudulent home loan refinancing (the "Loan") for which the Christian's bring causes of action distinct to each of them individually, and various other counts collectively.  This action against the Defendants seeks to redress the violations of Federal and state laws including, but not limited to:

      a. the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607 *et seq.* and its implementing Regulation X ("Reg. X");

b.      the Truth in Lending Act ("T1LA"), 15 U.S.C. § 1601 *et seq.* and its implementing

Regulation Z (Reg. Z");

c. the Homeowners Equity Protection Act, 15 U.S.C. § 1639 *et seq.* ("HOEPA");

d.      the Federal Mail Fraud Act, 18 USC § 1341 (the "Mail Fraud Act");

e. the Federal Wire Act, 18 U.S.C. § 1343 (the "Wire Act");

f. Bank Fraud Laws 18 U.S.C. § 1010, 1014, 1344 ("Bank Fraud");

g.      the Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. § 1692 *et seq.* (2000);

h.      the Racketeer Influenced and Corrupt Organizations Act ("R1CO"), 18 U.S.C.

§§ 1961 *et seq.*;

i. the Securities Act of 1933, 15 USC §§ 77a et. seq. (the "33 Act"), and Rules

promulgated thereunder by the Securities and Exchange Commission ("SEC"); and

j. for violations of several Commonwealth of Virginia statutes and laws including common

law causes of action for Forgery, Fraud in the Factum, and Fraud in the Inducement, and others.

3.      The conduct alleged warrants remedies and judgment at law for damages as well

as equitable injunctive relief against the Defendants.

4.      The Christians seek actual damages, statutory penalties and damages; the cost of

this action; compensatory and punitive damages; injunctive relief to stop any foreclosure pending

resolution of the issues being raised herein; attorneys' fees and other legal, declaratory relief so

the parties may each know their rights and responsibilities; and any such further equitable and

remedial remedies this Honorable Court may deem necessary or appropriate in its discretion.

## PLAINTIFFS

5.      Plaintiff Michele A. Christian, *pro se,* sues in her individual capacity and as Wife

and Husband.

6.      Plaintiff George H. Christian, *pro se,* sues in his individual capacity and as Wife

and Husband.

7.      The Christians reside at 1317 Avonlea Court, Chesapeake, Virginia 23322 ("the

"Property").

8.      At all times relevant to this Complaint, Mr. Christian was disabled as that term is

described under the Americans with Disabilities Act, with one or more major life activities

significantly restricted.  He has frequent and significant difficulties handling his daily affairs, and

is often unable to take care of his legal affairs.

9.      Because the fraud and other conduct alleged in this Complaint was not

discoverable by, and only became apparent to the Christians after they received copies of altered

documents provided by the Defendants in partial reply to the Christians' Qualified Written

Request – dated July 13, 2009 – the Christians invoke the  Discovery Rule and claim Equitable

Tolling due to Fraudulent Concealment, or any appropriate tolling of the statute of limitations.

## DEFENDANTS

1.      Mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary Defendant Fulton Financial Corporation ("Fulton Financial") is a regional financial holding company headquartered in Lancaster, Pennsylvania, in the business of originating mortgages and servicing loans on real property, and owns Resource Bank ("RB-FFC"). It is not yet determined which other REMIC, SPV or Structured Asset Mortgage Investment pool/tranche or certificates holders Fulton Financial represents in connection with the Plaintiffs' loans.

2.      Mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary Defendant Wells Fargo Bank, N.A.

3.      Wells Fargo Home Mortgage, Inc., is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

4.      America's Servicing Company (hereinafter "ASC"), is believed to be the current servicer of the Loan. ASC is a corporation with its principal place of business being located at 3476 Stateview Blvd. Fort Mill, SC 29715. It is not yet determined which other REMIC, SPV or Structured Asset Mortgage Investment pool/tranche or certificates holders ASC represents in connection with the Plaintiffs' loan.

7

5.      Mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary Defendant U.S. Bank National Association ("USBNA") is a national banking association with its principal place of business in Minneapolis, Minnesota. U.S. Bank operates in a number of states throughout the United States. U.S. Bank is a subsidiary, parent and owner or otherwise an affiliate of U.S. Bancorp, 800 Nicollet Mall, Minneapolis, MN 55402. It is not yet determined which other REMIC, SPV or Structured Asset Mortgage Investment pool/tranche or certificates holders USBNA represents in connection with the Plaintiffs' loan.

6.      Defendant Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS1"), is a Delaware corporation which also owns MERS2, an entity having the same name below.  MERS1's principal place of business is located in Reston, VA, as is the principal place of business for MERS2. Defendant MERS is licensed to and regularly does transact business in the Commonwealth of Virginia and the Commonwealth of Pennsylvania, including the *electronic* registration and *electronic* tracking of mortgage transfers, specifically including the Property. Defendant MERS1 acts as an electronic clearinghouse conduit, facilitator and non-government mortgage or security document tracking entity, specifically including the Loan subject to this Complaint.

7.      Defendant Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS2"), is a Delaware corporation incorporated January 1, 1999, bearing Delaware File

8

Registration Number 2990193 which is owned by MERS1, an entity having the same name above . MERS2's principal place of business is located in Reston, VA, in the same offices as MERS1. Defendant MERS2 regularly transacts business in the Commonwealth of Virginia and the Commonwealth of Pennsylvania, including the *electronic* registration and *electronic* tracking of mortgage transfers, specifically including the Property. MERS2 was allegedly set up by MERS1 as a bankruptcy and judgment remote subsidiary. The issue as to which MERS (1 or 2), when, why, and under what capacity MERS1 or MERS2, or both, is/are involved in the transactions involved herein can only be determined through discovery. Upon information and belief, the use of MERS1 or MERS2 depends on the circumstances present in each case and is a practice conducted by both defendant MERS to a) create confusion; b) allow for plausible deniability for wrongful acts; c) conducted in such a way as to obfuscate legal process and d) to abrogate legal and contractual responsibilities. Clearly the activities and modus operandi of Defendant MERS1 and Defendant MERS2 are anything but transparent. For the purposes of this Complaint, both MERS1 and MERS2 have been present and acted in different capacities with respect to the allegations herein asserted since inception of the Loan. For the purposes of this Complaint, both MERS1 and MERS2 shall be hereafter solely referred to as "Defendant MERS." Upon information and belief, only *one* MERS is authorized to do business in the Commonwealth of Virginia. Whether the licensed entity is MERS1 or MERS2, only Defendant MERS can tell.

8.      Defendant mortgage broker Resource Mortgage is wholly owned by Fulton Financial Corporation ("RM-FFC"), and at all times relevant hereto allegedly acted as a licensed mortgage broker in Virginia.  Further Defendant RM-FFC at all times relevant hereto acted as an agent of defendants Fulton Financial, RB-FFC, WELLS FARGO, USBNA, and MERS and acted solely for the benefit of its/their officers, associates, partners, successors, assigns, assignors, and mortgage pool securitizing agents, conspirators, co-conspirators, and Ponzi scheme creators.

9.      Defendant Samuel I. White, P.C. ("SIW") is a Virginia Beach, Virginia law firm and professional corporation with its principal offices located in Virginia Beach, VA.  SIW regularly conducts foreclosures on behalf of putative lien hold or allegedly authorized foreclosing entities which have not established their authority or ownership of the promissory notes authorizing them to foreclose on peoples' homes.

10.     Robert Bell, in his individual and professional capacities, is the purported Real Estate Appraiser that gave the appraisal relevant to this action;

11.     Real Estate Investment Protection Agency; is the purported title company that provided services relevant to this action.

12.     Defendant Chaytor Midgette, in his individual and professional capacity, is the Mortgage Broker in connection with the Loan at issue in this Complaint and employee of Resource;

13.     Defendant John Abad in his individual and professional capacity; was the purported "notary" that purportedly provided service relevant to this action.

14.     Defendants JOHN DOE AND JANE DOE ("JOHN & JANE DOES") represent the unknown notary that signed documents in connection with the plaintiffs' Loan, and the other individual or individuals presently unknown who conspired and otherwise participated with the named defendants in the wrongdoing described in the Complaint.  Because the Christians are

unaware at this time of the true names and capacities of defendants sued as JOHN & JANE

DOES 1-100, inclusive, they sue these defendants by such fictitious names. As such, the

Christians will amend this Complaint to add defendants JOHN & JANE DOES true names and

capacities when and if they become known.

15.     ABC CORPORATIONS (hereinafter "ABC CORPS") represent defendants'

corporations, partnerships, entities yet to be determined, if any, also involved in the real estate

loan transaction, unidentified real estate appraisers, mortgage note purchasers, securitization

entities, REMICs, Special Purpose Vehicles ("SPV"), collateralized mortgage pool insurer

involved in this case,  Defendant ABC CORPS' identities are presently unknown, but conspired

and otherwise participated with the named defendants in the wrongdoing described in this

Complaint. This Complaint will be amended to add these other corporations or business entities

when and if the true names and capacities become known.

16.     RESOURCE BANK, One Penn Square, Lancaster, PA 17604, is a mortgage loan

table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler,

mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

17.     RESOURCE MORTGAGE, One Penn Square, Lancaster, PA 17604, is a

mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme

creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real

party in interest.

18.     WELLS FARGO FUNDING, INC. Minneapolis, MN, is a mortgage loan table

funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler,

mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

19.     US BANCORP, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

20.     US BANK NATIONAL ASSOCIATION, 60 Livingston Avenue, St. Paul, MN 55051, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

21.     CMSC MORTGAGE BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-5 9062 Old Annapolis Road, Columbia MD 21045, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest..

22.     CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., 11 Madison Ave, New York, NY 10010, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

23.     CREDIT SUISSE SECURITIES (USA) LLC, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

24.     CREDIT SUISSE MANAGEMENT, LLC, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

25.     CREDIT SUISSE HOLDINGS (USA), INC., Depository trust company, a New York Limited purpose trust company, is a mortgage loan table funder, mortgage note buyer,

assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

26.     CLEARSTREAM, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

27.     EUROCLEAR SYSTEM, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

28.     EUROCLEAR BANK S.A./ N.V, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

29.     EUROCLEAR SYSTEM CLEARANCE SYSTEMS S.C., A Belgium Co-Operative Corporation, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

30.     DLJ MORTGAGE CAPITAL, INC. A Delaware Corporation, 11 Madison Ave New York, NY 10010, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

31.     AMERICAN HOME MORTGAGE CORP., is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

32.     COUNTRYWIDE HOME LOANS SERVICING LP. A Texas Limited Partnership 7105 Corporate Drive Plano, TX  75024, is a mortgage loan table funder, mortgage note buyer,

assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

33.    COUNTRYWIDE GP, INC., A Nevada Corporation, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

34.    COUNTRYWIDE LP, INC. A Nevada Corporation, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

35.    COUNTRYWIDE HOME LOANS A New York Corporation, 4500 Park Granada, Calabasas, CA 91302, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

36.    CITIBANK, As depositary for Clearstream, Luxemberg, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

37.    JP Morgan Chase, NA, Depositary for Euroclear, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

38.    CEDE & CO., Holder of Record DTC Registered Certificates, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

39.    COUNTRYWIDE SERVICING, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

40.     COUNTRYWIDE FINANCIAL CORPORATION.A Delaware Corporation, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

41.     SELECT PORTFOLIO SERVICING, INC. A Utah Corporation, 3815 South West Temple Salt Lake City, UT 84115, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

42.     CREDIT SUISSE FINANCIAL CORPORATION, A Delaware Coporation, 302 Carnegie Center, 2nd Floor, Princeton, NJ 08540, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest..

43.     BANK OF AMERICA, N.A., is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

44.     COUNTRYWIDE HOME LOANS SERVICING, is a mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, Ponzi scheme creator, gambler, mortgage pool sponsor, securitizing agent, conduit and beneficiary, and real party in interest.

45.     Whenever any reference is made in this Complaint to any act of any defendant, that allegation shall mean that each defendant acted individually and jointly with the other defendants.

46.     Upon information and belief, plaintiffs allege that at all times mentioned in this Complaint, defendants were agents, servants, partners and/or employees of their co-defendants, in doing the actions mentioned herein were, unless otherwise alleged, within the course and

scope of their authority as such agent, servant, partner, and/or employee with the permission and consent of co-defendants.

47.     Any allegations about acts of any corporate or other business defendant means the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority and/or within the scope of their agency, if acting as an agent of another.

48.     The plaintiffs believe and are informed, and on that basis allege that each of the defendants, including the DOE defendants, were legally responsible for the unlawful actions, unlawful policies, and unlawful practices contained in this Complaint. Further, each defendant, unless specifically excluded herein, committed, or was a co-conspirator/accomplice, to the acts alleged in this Complaint.

49.     Additionally, each defendant knew or realized that the other defendants were engaging in or planned to engage in the violation of laws alleged in this Complaint. Knowing or realizing the other defendants were engaging or planning to engage in unlawful conduct, actions, or practices, each defendant nonetheless facilitated and even directed or assisted in the commission of the unlawful acts.

50.     Each defendant intended and did encourage, facilitate, or assist in the commission of the unlawful acts and thereby aided and abetted the other defendants in the unlawful conduct.

51.     The Complaint will be amended to set forth the true names and capacities of each defendant, along with the appropriate charging allegations when the same have been ascertained.

52.     At all relevant times, defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in violations of law alleged in this Complaint. This conspiracy, common enterprise, and common course of conduct started more than three years ago and continues to the present, with each

acting jointly and severally, as if the act of any one of them were the act of the other, whether as principal, under an implied agency, or with actual or apparent authority to perform the acts alleged, with the permission and consent of co-defendants.

## JURISDICTION AND VENUE

53.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, as well as the specific grants of federal court jurisdiction under the federal laws represented by TILA, RESPA, HOEPA, the Securities Act of 33, the Wire Act, the Mail Fraud Act, Bank Fraud, and RICO, as this is a civil action arising under the laws of the United States.

54.     This Court has supplemental jurisdiction of the state law causes of action asserted herein pursuant to 28 U.S.C. §1367(a) as these claims are so related and inexorably intertwined to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

55.     Venue is proper in Pennsylvania under 28 U.S.C. §§ Section 1391(a)(2) because a substantial part of the events giving rise to this action occurred here in the Eastern District of Pennsylvania.

56.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. 1391(b)(1).  Defendants are subject to Pennsylvania's long arm statute because each has established the most minimum contacts with this Commonwealth allowed under the Constitution of the United States, and each have availed themselves of the privilege of conducting business here.

57.     Venue is proper because Fulton Financial is headquartered here.

58.     The Court Should exercise personal jurisdiction under the "Source of Strength" doctrine, thus venue is proper.  The "source of strength" doctrine has recognized that bank holding companies owe a duty to accept obligations of their subsidiary banks, in addition to its own activities.

17

59.     Jurisdiction of this court for the pendent claims is authorized by Fed. R. Civ. P. 18(a)(b).

## LIBERAL CONSTRUCTION

60.     Plaintiffs are pro se, and pray this Court apply liberal construction to their pleadings. Accordingly, plaintiffs ask this Court to read into, develop, accept all claims however inartfully pleaded, and to permit any and all available remedies in law and in equity, to the fullest extent permissible by law and judicial discretion.

61.     If the Court should find their pleadings defective in any way, plaintiffs ask for liberal leave to amend so that a trial on the merits – before a jury of their peers – may be had in the furtherance of justice.

62.     Plaintiffs pray for the relief requested, and any other and further relief upon which relief may be granted in law and in equity, and in support say:

## FACTS

63.     The Christians own their home, 1317 Avonlea court, Chesapeake, Virginia, as joint tenants by the entirety (the "Property").

64.     Throughout 2005 RM-FFC solicited the plaintiffs to take a conventional loan against the Property.

65.     Throughout 2005 Chaytor Midgett ("Mr. Midgett"), an employee of RM-FFC, also solicited the plaintiffs to take a loan.

66.     At all times relevant to this Complaint, Mr. Midgett was a trusted advisor to the Christians:

   a. He was Mr. Christian's golfing instructor, and golf partner;
   b. He was a personal friend of the Christians.

18

67.     At or around August 2005, in conjunction with his offer to loan, Mr. Midgett arranged to have the property appraised.

68.     Sometime after the appraisal was purportedly conducted, Mr. Midgett informed Mr. Christian the property appraised for $1.3 million.

69.     A copy of the appraisal was never given to the Christians.

70.     According to Mr. Midgett, Mrs. Christian's half share was worth about $650,000.00.

71.     There is no way of knowing, except through discovery, whether the real estate values contained in the alleged appraisal and obtained for the Loan was properly, accurately, independently, and honestly derived at, and whether or not there were any other undisclosed and improper "fee-splitting arrangements" in existence at the time of the transaction in violation of RESPA and CRESPA.

72.     There is no way of knowing, except through appropriate discovery, whether the value of the Property was inflated on the alleged appraisal.

73.     Mr. Midgett was an agent to the Christians.

74.     Mr. Midgett held himself out as having the expertise to provide financial advice and undertook to act as the Christians' fiduciary by functioning as their broker to obtain financing best suited to their situation.

## MRS. CHRISTIAN AND THE LOAN

75.     Mr. Midgett and RM-FFC offered a conventional loan to Mrs. Christian:

    a. with Mrs. Christian's half interest in the Property as security;
    b. in the amount of $522,500.00;
    c. with a fixed repayment term of 30 years; and
    d. with a fixed interest rate of 5.875%.

76.     Mrs. Christian accepted the conventional loan (the "Loan")

19

n.  the Deed does not reference the Note described in and secured by the purported
Deed dated December 22, 2005.

82.  Mrs. Christian denies the documents provided by the defendants and attached hereto are true and authentic copies of the original Loan documents.

83.  Mrs. Christian had no way of knowing, and only discovered the fraud and other conduct alleged in this Complaint less than two years prior to filing this Complaint.

84.  Mrs. Christian's cause of action was fraudulently concealed, and she should not be prevented from pursuing it.

85.  Mrs. Christian neither acknowledged, nor executed any of the purported documents relevant to the Loan in the presence of a notary.

86.  Mr. Midgett specifically informed Mrs. Christian that she was executing two originals of the loan documents.

87.  Mr. Midgett specifically informed Mrs. Christian that Mr. Christian was not required to convey his interest in the Property.

88.  Mr. Midgett specifically informed Mrs. Christian that the documents she signed:

a.  were For the Loan to her only in the amount of $522,500.00;

b.  prescribed a conventional fixed repayment term of 30 years; and

c.  prescribed a fixed interest rate of 5.875%.

89.  Upon information and belief, the first original document set was presented to Mrs. Christian for signature with the correct terms 5.75%, but the second original document set was surreptitiously substituted with documents containing the disputed terms, specifically the interest only loan of 6.75%;

90.  The documents were materially altered after they were signed by Mrs. Christian.

21

91.     The documents were forged and do not bear the true and authentic original signature of Mrs. Christian.

92.     Mrs. Christian was never informed that she was executing a Deed materially different from what she agreed to.

93.     Mr. Midgett and RM-FFC fraudulently and through trickery obtained the purported signature of Mrs. Christian on the purported Deed, provided by the defendants and attached hereto as Exhibit  bearing an interest rate of 6.75%.

94.     Mr. Midgett  and RM-FFC fraudulently and through trickery obtained the purported signature of Mrs. Christian on the purported Note bearing an interest rate of 6.75%.

95.     The plaintiffs believe and are informed, and on that basis allege, that Mrs. Christian unknowingly signed a Deed for 6,75%.

96.     Mrs. Christian was injured in her property because the interest rate and terms of the loan are materially different than what was promised.

97.     Mrs. Christian did not knowingly sign the interest only 6.75% Deed, and the extra interest expense is causing financial burden and is unjustly enriching the defendants.

98.     Mrs. Christian believed, and Mr. Midgett , and RM-FFC led her to believe, that the Loan was a conventional 30 years loan bearing interest at 5.875%.

99.     Mr. Midgett 's and RM-FFC's fraud induced Mrs. Christian to sign the alleged deed of trust with neither the knowledge nor reasonable opportunity to learn of its character or its essential terms, since at no time prior to and at the time of the execution of the alleged fraudulent deed of trust was Mrs. Christian actually aware or informed that she was executing any Deed other than one that reflected the agreement of the parties for 5.875%.

100.     Mr. Midgett specifically informed Mrs. Christian she was signing a Deed bearing an interest rate of 5.875%.

101.    Mr. Midgett specifically informed Mrs. Christian she was signing a Note bearing an interest rate of 5.875%.

102.    Mr. Christian did not knowingly sign the Note bearing the interest rate of 6.75%.

103.    Mrs. Christian neither acknowledged, nor executed any of the purported documents relevant to the Loan in the presence of a notary.

104.    Mrs. Christian avers she knew the contents of the Deed and Note and they reflected the agreed upon terms.  She argues that if she is found to not know the contents of Deed and Note, such lack of knowledge was a direct result of Mr. Midgett's ruse that the second document set – surreptitiously substituted – specifically reflected the agreed upon interest rate of 5.875%.

105.    Mrs. Christian reposed trust and confidence in Mr. Midgette and RM-FFC with regard to the documents related to the Loan.

106.    Mr.  Midgette and RM-FFC sought and accepted the trust and confidence of Mrs. Christian and fostered such confidential relationships.

107.    As a result of their confidential relationship, Mrs. Christian was justified in believing that Mr. Midgett and RM-FFC's statement of the nature of the document presented to her was trustworthy.

108.    Mrs. Christian was without legal counsel relating to Loan, at all times relating to the Loan.

109.    Mrs. Christian had no reason to distrust Mr. Midgett or RM-FFC.

110.    By engaging in the conduct alleged herein, Mr. Midgett and RM-FFC willfully engaged in fraud in the factum.

111.    Mrs. Christian has been injured as a result of the aforesaid acts of the defendants which constitute fraud in the factum.

112.    Mrs. Christian was fraudulently induced to sign because of the false information provided by Mr. Midgett  and RM-FFC and was duped into signing the purported documents relevant to the Loan, and she did not receive the loan which she applied for under the terms agreed.

113.    Mrs. Christian relied on the representations of Mr. Midgett and RM-FFC, and she was injured, in an amount to be determined at trial.

114.    Mr. Midgett, RM-FFC, and all the defendants realized a greater profit from the surreptitiously substituted loan, and all were unjustly enriched in an amount to be discovered, and proven at trial.

115.    Mrs. Christian had no way of knowing, and only discovered the fraud and other conduct alleged in this Complaint less than two years prior to filing this Complaint.

116.    Mrs. Christian's cause of action was fraudulently concealed, and she should not be prevented from pursuing it.

117.    By engaging in the conduct alleged herein, Mr. Midgett and RM-FFC willfully engaged in fraud in the inducement.

118.    Mrs. Christian has been injured as a result of the aforesaid acts of the defendants which constitute fraud in the inducement.

119.    By engaging in the conduct alleged herein, Mr. Midgett and RM-FFC willfully engaged in constructive fraud in the inducement.

120.    Mrs. Christian has been injured as a result of the aforesaid acts of the defendants which constitute constructive fraud in the inducement.

## MR. CHRISTIAN'S DISABILITIES

121.    At all times relevant to the Loan, including when purported documents were signed in conjunction with the Loan, and at all times relevant to this Complaint, Mr. Christian

was *non compos mentis* due to his severe bipolar disorder and the disabling effects of prescription medication. As such, Mr. Christian:

    a.  did not possess the necessary mental capacity to understand or appreciate the effects of his actions;

    b.  did not have the requisite mental capacity to knowingly convey his interest in the Property;

    c.  did not have the requisite mental capacity to be a party to the Loan;

    d.  did not have the requisite mental capacity to enter into a contract;

    e.  was not competent to make decisions related to the Property.

    f.  did not understand the terms of the Loan document(s);

    g.  was unable to understand the nature and consequences of the transaction;

    h.  was unable to act in a reasonable manner in relation to the transaction.

122.      Because of his close confidential relationship with Mr. Christian, Mr. Midgett had reason to know that Mr. Christian:

    a.  did not possess the necessary mental capacity to understand or appreciate the effects of his actions;

    b.  did not have the requisite mental capacity to knowingly convey his interest in the Property;

    c.  did not have the requisite mental capacity to be a party to the Loan;

    d.  did not have the requisite mental capacity to enter into a contract;

    e.  was not competent to make decisions related to the Property.

    f.  did not understand the terms of the Loan document(s);

    g.  was unable to understand the nature and consequences of the transaction; and

    h.  was unable to act in a reasonable manner in relation to the transaction.

123.      Mr. Midgett pressured and rushed Mr. Christian to complete the signing of the document quickly.

124.      Mr. Christian did not understand the terms of the Loan.

125.      Mr. Christian was suffering from prescription medication intoxication at the time the purported Loan document(s) were signed.

126.      Because of Mr. Christian's severe bipolar disorder and prescription medication intoxication, no agreement was made on fair terms.

127.     Due to his severe bipolar disorder and the ongoing disabling effects of prescription medication, Mr. Christian had been continuously incapacitated for more than two of the last five years during the applicable statute of limitations.

128.     Mr. Christian is entitled to and does invoke tolling of the statute of limitations under applicable Federal and State law.

129.     Due to his bipolar condition, Mr. Christian only discovered the fraud and other conduct alleged in this Complaint less than two years prior to filing this Complaint.

130.     Mr. Christian had no way of knowing, and only discovered the fraud and other conduct alleged in this Complaint less than two years prior to filing this Complaint.

131.     Mr. Christian's causes of action were fraudulently concealed, and he should not be prevented from pursuing them.

## MR CHRISTIAN APPEARS TO BE BOTH A BORROWER AND NOT A BORROWER AS EVIDENCED BY THE LOAN DOCUMENTS AND TESTIMONY OF THE DEFENDANTS

132.     Mr. Christian contends that he is not a Borrower or party to the Loan.

133.     He is, however, repeatedly identified as a Borrower in the purported Loan documents provided by the defendants, attached hereto, and is alleged to be a Borrower by the defendants themselves.

134.     Therefore, Mr. Christian is forced to plead that he is not a Borrower, and in the alternative that he is a Borrower.

135.     Mr. Christian requests the Court permit limited, expedited discovery of the matter, and compel production by the defendants of all the original documents relevant to the Loan, to permit the Court to make a finding.

136.     In the event the discovery reveals Mr. Christian is in fact a Borrower or party to the Loan, he has plead jointly with Mrs. Christian as a Borrower herein.

137.     In the event the discovery reveals Mr. Christian is not a Borrower or party to the Loan as he believes, he requests that the Court deem the Counts and allegations where he has plead jointly with Mrs. Christian as Borrower to be allowed to reflect Mrs. Christian only as Borrower, without prejudice to the parties.

## MR. CHRISTIAN AND THE LOAN

138.     On or about December 15, 2005, after agreeing to provide Mrs. Christian with a Loan specific to her in all respects, Mr. Midgett informed Mr. Christian his signature was required in conjunction with the Loan, specifically and only to subordinate a previous second mortgage loan.

139.     Mr. Midgett specifically informed Mr. Christian that he was only executing two originals of a subordination agreement.

140.     Mr. Midgett specifically informed Mr. Christian that he was not required to sign a Deed.

141.     Mr. Midgett specifically informed Mr. Christian that he was not required to convey his interest in the Property.

142.     Mr. Midgett specifically informed Mr. Christian he was not signing a Deed.

143.     Mr. Midgett  specifically informed Mr. Christian he was not signing a Note.

144.     Mr. Christian did not knowingly sign the purported Deed.

145.     Mr. Christian did not knowingly sign the purported Note.

146.     Mr. Midgett's and RM-FFC's fraud induced Mr. Christian to sign the purported Deed with neither the knowledge nor reasonable opportunity to learn of its character or its essential terms, since at no time prior to and at the time of the execution of the alleged deed of trust was Mr. Christian actually aware or informed that he was executing any Deed.

27

147.    Mr. Christian signed what he believed to be two originals of a subordination agreement in favor of RM-FFC, presumably subordinating the second mortgage.

148.    Upon information and belief, the second signature page – of the two original documents represented by Mr. Midgett to be the duplicate subordination agreements – was actually the signature page of the purported Deed.

149.    Mr. Midgett and RM-FFC fraudulently and through trickery obtained the purported signature of Mr. Christian on the purported Deed.

150.    Mr. Christian was never informed that he was executing a deed of trust transferring title to his home.

151.    Mr. Midgett nor RM-FFC gave any loan proceeds to Mr. Christian in conjunction with the Loan.

152.    Mr. Midgett nor RM-FFC gave any consideration to Mr. Christian in conjunction with the Loan for his half interest in the Property.

153.    Mr. Christian was not knowingly a party to the Loan.

154.    Mr. Christian believes and is informed, and on that basis alleges, that he was unknowingly made a party to the purported Note.

155.    Mr. Christian believes and is informed, and on that basis alleges, that he was unknowingly made a party to the purported Deed.

156.    Mr. Christian believes and is informed, and on that basis alleges, that he is a party to the Loan.

157.    Mr. Christian was injured in his property in the origination of the Loan because his fifty percent interest in the Property has been fraudulently conveyed by a Deed he did not knowingly sign, to secure a loan he is not party to, nor received any consideration for.

158.     Mr. Christian believed, and Mr. Midgett and RM-FFC led him to believe, that the Loan was solely in Mrs. Christian's name.

159.     Mr. Christian neither acknowledged, nor executed any of the purported documents relevant to the Loan in the presence of a notary.

160.     Alternatively, Mr. Christian not knowing the contents of the purported Deed was a direct result of Mr. Midgett's and RM-FFC's ruse that the document was specifically and only a subordination agreement.

161.     Mr. Christian reposed trust and confidence in Mr. Midgett and RM-FFC with regard to the documents related to the Loan.

162.     Mr.  Midgett and RM-FFC sought and accepted the trust and confidence of Mr. Christian and fostered such confidential relationships.

163.     As a result of their confidential relationship, Mr. Christian was justified in believing that Mr. Midgett and RM-FFC's statement of the nature of the document presented to him was trustworthy.

164.     Mr. Christian without legal counsel relating to Loan, at all times relating to the Loan

165.     By engaging in the conduct alleged herein, Mr. Midgett and RM-FFC willfully engaged in fraud in the factum.

166.     Mr. Christian has been injured as a result of the aforesaid acts of the defendants which constitute fraud in the factum.

167.     Mr. Christian was fraudulently induced to sign because of the false information provided by Mr. Midgett and RM-FFC and was duped into signing the purported documents relevant to the Loan.

168.    Mr. Christian relied on the representations of Mr. Midgett and RM-FFC, and he was injured, in an amount to be determined at trial.

169.    Mr. Christian had no reason to distrust Mr. Midgett or RM-FFC.

170.    By engaging in the conduct alleged herein, Mr. Midgett and RM-FFC willfully engaged in fraud in the inducement.

171.    Mrs. Christian has been injured as a result of the aforesaid acts of the defendants which constitute fraud in the inducement.

172.    By engaging in the conduct alleged herein, Mr. Midgett and RM-FFC willfully engaged in constructive fraud in the inducement.

173.    Mr. Christian has been injured as a result of the aforesaid acts of the defendants which constitute constructive fraud in the inducement.

174.    Due to his severe bipolar disorder and the ongoing disabling effects of prescription medication, Mr. Christian had been continuously incapacitated for more than two of the last five years during the applicable statute of limitations,

175.    Mr. Christian is entitled and does invoke tolling of the statute of limitations under applicable Federal and State law.

176.    Due to his bipolar condition, Mr. Christian discovered the fraud and other conduct alleged in this Complaint less than two years prior to filing this Complaint.

177.    Mr. Christian had no way of knowing, and only discovered the fraud and other conduct alleged in this Complaint less than two years prior to filing this Complaint.

178.    Mr. Christian's causes of action were fraudulently concealed, and he should not be prevented from pursuing them.

## **THE FORECLOSURE PROCEEDINGS**

179.     Mr. Christian suffered a near fatal accident on October 31, 2008, lost his left eye to permanent blindness, and subsequently endured two weeks in intensive care and follow up plastic surgery.

180.     Due to disability, Mr. Christian was unable to work.

181.     In February 2009, defendants commenced a foreclosure action against the property on behalf of purported party in interest **Wells Fargo Home Mortgage**, for alleged default by Mrs. Christian as acknowledged by letter from SIW dated February 19, 2009. (Exhibit A).

182.     Upon information and belief, the purported party in interest according to the Substitute Trustee filed in the land records of Chesapeake, Virginia was represented to be USBNA.

183.     Plaintiffs disputed the amount due at the time of foreclosure.

184.     Plaintiffs dispute the amount due at this time.

185.     Plaintiffs denied that the true party in interest was a party to the foreclosure proceedings.

186.     The foreclosure was canceled after $23.774.75 was paid to defendants.

187.     At all time relevant to this Complaint, defendants were debt collectors as defined under 15 U.S.C. §1692a(6).

## MRS. CHRISTIANS JUNE 2, 2009 QUALIFIED WRITTEN REQUEST PURSUANT TO RESPA

188.     Mrs. Christian submitted a Qualified Written Request to ASC by letter dated June 2, 2009, to dispute the debt alleged by ASC to be owed to Wells Fargo Home Mortgage. ("QWR1")(Exhibit B).

189.   The QWR1 requested information to validate the amount of the debt, and whether the interest and principal had been properly calculated and applied to the loan, among other information. (QWR1 pg. 2 at 8.)

190.   ASC only partially responded by letter dated July 13, 2009 to the QWR1. ("QWR1 Response")(Exhibit C).

191.   Only after receiving the QWR1 response were the plaintiffs able to discover – and in fact only then did discover – the fraud and other conduct alleged in the Complaint.

192.   ASC did not acknowledge the QWR1 within 20 days as prescribed by law.

193.   ASC's partial QWR1 Response failed to provide basic information requested.

194.   ASC advised that information requested would not be provided "without a subpoena."

195.   ASC made representations to credit reporting agencies regarding plaintiffs' mortgage delinquency which were materially false.

196.   ASC knowingly, intentionally, and willfully violated RESPA by failing to provide a complete and accurate response to the QWR1.

197.   ASC maintains an ongoing unlawful pattern and practice of knowingly, intentionally, and willfully violating valid information requests under RESPA.

198.   Plaintiffs were injured by ASC's violation of RESPA.

199.   Although Mr. Christian is not a party to the purported debt, ASC has repeatedly left three to five harassing, annoying collection messages each week on Mr. Christian's private voice mail, for the past several months.

200.   ASC continues to leave personal and private information about Mrs. Christian's debt on a third party's voice mail.

201.     Mr. Christian was, and continues to be injured by ASC's ongoing, intentional, and willful violation of FDCPA.

202.     Mrs. Christian was, and continues to be injured by ASC's ongoing, intentional, and willful violation of FDCPA.

203.     ASC provided the following documents attached to its QWR1 Response, and purported each to be a true copy of the original documents relative to the Loan. Plaintiffs dispute the authenticity of these documents and demand strict proof thereof:

### The Purported Settlement Statement (Exhibit D):

204.     The defendants provided a copy of the purported Settlement Agreement to the plaintiffs and alleged it to be a true copy of the original. Plaintiffs deny that it is a true copy of the authentic original document.

205.     Plaintiffs respectfully request this Court compel expedited production by the defendants of the purported original Settlement Agreement.

206.     Plaintiffs demand strict proof of the authenticity of the document.

207.     The purported Settlement Agreement:

    a. Identifies both "George Christian and Michele Christian" as **Borrowers**;
    b. Was not signed by the Christians;
    c. Upon information and belief, was materially altered;
    d. Falsely identifies the place of settlement as 113 Holly Crescent, Suite 101, Virginia Beach, Virginia  23451;
    e. Reflects "cash from borrower" which does not match the purported Uniform Residential Loan Application.
    f. Was not provided to plaintiffs at any time prior to the QWR1 Response.

### The Purported HUD Addendum (Exhibit E):

208.     The defendants provided a copy of the purported HUD Addendum to the plaintiffs and alleged it to be a true copy of the original. Plaintiffs deny that it is a true copy of the authentic original document.

33

209.    Plaintiffs respectfully request this Court compel expedited production by the defendants of the purported original Settlement Agreement.

210.    Plaintiffs demand strict proof of the authenticity of the document.

211.    The purported HUD Addendum:

    a.  Identifies both George Christian and Michele Christian as **Sellers**;
    b.  Was not signed by Mr. Christian;
    c.  Was not knowingly signed by Mr. Christian;
    d.  Upon information and belief, Mr. Christian's purported signature appearing on this document is a forgery;
    e.  Was not signed by Mrs. Christian;
    f.  Was not knowingly signed by Mrs. Christian;
    g.  Upon information and belief, Mrs. Christian's purported signature appearing on this document is a forgery;
    h.  Upon information and belief, was materially altered;
    i.  The purported "settlement agent" does not attest to the purported signatures of the Christians;
    j.  Was not provided to plaintiffs at any time prior to the QWR1 Response.

### The Purported Uniform Residential Loan Application (Exhibit F):

212.    The defendants provided a copy of the purported Uniform Residential Loan Application to the plaintiffs and alleged it to be a true copy of the original. Plaintiffs deny that it is a true copy of the authentic original document.

213.    Plaintiffs respectfully request this Court compel expedited production by the defendants of the purported original Uniform Residential Loan Application.

214.    Plaintiffs demand strict proof of the authenticity of the document.

215.    The Uniform Residential Loan Application:

    a.  Contains false information fraudulently manufactured by RM-FFC;
    b.  Identifies Michele Christian as **Borrower**.
    c.  Identifies George Christian as **Co-Borrower**;
    d.  Was not signed by Mr. Christian;
    e.  Was not knowingly signed by Mr. Christian;
    f.  Upon information and belief, bears a forgery of Mr. Christian's signature;
    g.  Was not initialed by Mr. Christian;

h.  Was not knowingly initialed by Mr. Christian;
i.  Upon information and belief, bears forgeries of Mr. Christian's initials;
j.  Was not signed by Mrs. Christian;
k.  Was not knowingly signed by Mrs. Christian;
l.  Upon information and belief, bears a forgery of Mrs. Christian's signature;
m.  Was not initialed by Mrs. Christian;
n.  Was not knowingly initialed by Mrs. Christian;
o.  Upon information and belief, bears forgeries of Mrs. Christian's initials;
p.  Upon information and belief, was materially altered;
q.  Does not reflect the agreement of the parties;
r.  Reflects inaccurate assets and liabilities intentionally and fraudulently inserted into the document by defendants without the knowledge or permission of the plaintiffs;
s.  Reflects "cash from borrower" which does not match Settlement Statement;
t.  The purported interviewer, Chaytor Midgett, does not attest to the purported signatures or purported initials of the Christians;
u.  Upon information and belief, Mr. Midgett's signature is a forgery;
v.  Was not provided to plaintiffs at any time prior to the QWR1 Response.

**The purported Uniform Underwriting and Transmittal Summary (Exhibit G):**

216.   The defendants provided a copy of the purported Underwriting and Transmittal Summary to the plaintiffs and alleged it to be a true copy of the original. Plaintiffs deny that it is a true copy of the authentic original document.

217.   Plaintiffs respectfully request this Court compel expedited production by the defendants of the purported original Underwriting and Transmittal Summary.

218.   Plaintiffs demand strict proof of the authenticity of the document.

219.   The purported Underwriting and Transmittal Summary:

a.  Was completed by defendants;
b.  Identifies Michele Christian as **Borrower**.
c.  Was not signed by either Christian;
d.  Upon information and belief, was materially altered;
e.  Does not reflect the agreement of the parties;
f.  Identifies the purported processor as Kitty Parker, who did not sign the document;
g.  No signatures appear on this document to authenticate it;

35

h. Was not provided to plaintiffs at any time prior to the QWR1 Response.

**The purported Federal Truth-in-lending Disclosure statement (Exhibit H):**

220.    The defendants provided a copy of the purported Federal Truth-in-Lending disclosure to the plaintiffs and alleged it to be a true copy. Plaintiffs deny that it is a true copy of the authentic original document.

221.    Plaintiffs respectfully request this Court compel expedited production by the defendants of the purported original Federal Truth-in-Lending disclosure.

222.    Plaintiffs demand strict proof of the authenticity of the document.

223.    The purported Federal Truth-in-Lending disclosure:

> a. Identifies Michele Christian as **Borrower;**
> b. Was not signed by Mr. Christian;
> c. Was not knowingly signed by Mr. Christian
> d. Upon information and belief, bears a forgery of Mr. Christian's signature;
> e. Was not signed by Mrs. Christian;
> f. Was not knowingly signed by Mrs. Christian;
> g. Upon information and belief, bears a forgery of Mrs. Christian's signature;
> h. Upon information and belief, was materially altered;
> i. Does not reflect the agreement of the parties;
> j. Was not provided to plaintiffs at any time prior to the QWR1 Response.

**The Purported Good Faith Estimate at 6.75% Fixed (Exhibit I):**

224.    The defendants provided a copy of the purported Good Faith Estimate evidencing the incorrect, non-disclosed rate of 6.75% to the plaintiffs and alleged it to be a true copy of the original. Plaintiffs deny that it is a true copy of the authentic original document.

225.    Plaintiffs respectfully request this Court compel expedited production by the defendants of the purported original Good Faith Estimate evidencing the incorrect, non-disclosed rate of 6.75%.

226.    Plaintiffs demand strict proof of the authenticity of the document.

227.    The purported Good Faith Estimate evidencing the incorrect, non-disclosed rate of 6.75%:

      a.  Identifies Michele Christian as **Borrower**;
      b.  Was not signed by either Christian;
      c.  Identifies a fixed rate, conventional loan;
      d.  Identifies an undisclosed interest rate of 6.75%;
      e.  Does not accurately reflect the agreement of the parties;
      k.  Was not provided to plaintiffs at any time prior to the QWR1 Response.

### The Purported Good Faith Estimate at 5.875% (Exhibit J):

228.    The defendants provided a copy of the purported Good Faith Estimate evidencing the agreed upon interest rate of 5.875% to the plaintiffs and alleged it to be a true copy of the original. Plaintiffs deny that what the defendants provided is a true copy of the authentic original document.

229.    Plaintiffs respectfully request this Court compel expedited production by the defendants of the purported Good Faith Estimate evidencing the agreed upon interest rate of 5.875%.

230.    Plaintiffs demand strict proof of the authenticity of the document.

231.    The purported Good Faith Estimate evidencing the agreed upon interest rate of 5.875%:

      a.  Identifies Michele Christian as **Borrower**.
      b.  Was not signed by Mr. Christian;
      c.  Was not signed by Mrs. Christian;
      d.  Was not knowingly signed by Mrs. Christian;
      e.  Upon information and belief, bears a forgery of Mrs. Christian's signature;
      f.  Upon information and belief, was materially altered;
      g.  Does not fully reflect the agreement of the parties;
      h.  Correctly reflects the interest rate agreed;
      i.  Was not provided to plaintiffs at any time prior to the QWR1 Response.

## The Purported Note (Exhibit K):

232.     The defendants provided the attached copy of the purported original Note to

plaintiffs and alleged it to be a true copy. Plaintiffs deny that it is a true copy of the authentic

original document.

233.     Plaintiffs respectfully request this Court compel expedited production by the

defendants of the purported original Note.

234.     Plaintiffs demand strict proof of the authenticity of the document.

235.     The purported Note:

     a.  Does not identify Mr. or Mrs. Christian as Borrowers in its caption;
     b.  Was not signed by Mr. Christian;
     c.  Was not knowingly signed by Mr. Christian;
     d.  Upon information and belief, another note bearing Mr. Christian's purported signature exists;
     e.  The other Note which is believed to exist was not knowingly signed by Mr. Christian;
     f.  The other note bears a forgery of Mr. Christian's signature;
     g.  Was not signed by Mrs. Christian;
     h.  Was not knowingly signed by Mrs. Christian;
     i.  Upon information and belief, bears a forgery of Mrs. Christian's signature;
     j.  Was not initialed by Mrs. Christian;
     k.  Was not knowingly initialed by Mrs. Christian;
     l.  Upon information and belief, bears forgeries of Mrs. Christian's initials;
     m.  Upon information and belief, was materially altered;
     n.  Does not reflect the agreement of the parties;
     o.  Was signed separate from the Deed;
     a.  The purported notary, name illegible, does not attest to the purported signature or initials of Mrs. Christian;
     p.  Is not the Note described in and secured by the purported Deed date December 22, 2005;
     q.  Was not provided to plaintiffs at any time prior to the QWR1 Response.

## The Purported Deed of Trust (Exhibit L):

236.     The defendants provided the attached copy of the purported original Deed to

plaintiffs and alleged it to be a true copy. Plaintiffs deny that it is a true copy of the authentic

original Deed.

237.    Plaintiffs respectfully request this Court compel expedited production by the

defendants of the purported original Note.

238.    Plaintiffs demand strict proof of the authenticity of the document.

239.    The purported Deed:

   a. Purports to be given by Michele A. Christian, and George Christian, Wife
      and  Husband;
   b. Identifies Lender as Resource Bank;
   c. Identifies both George Christian and Michele Christian as **Borrowers**;
   d. Was not signed by Mr. Christian;
   e. Was not knowingly signed by Mr. Christian;
   f. Upon information and belief, bears a forgery of Mr. Christian's signature;
   g. Was not initialed by Mr. Christian;
   h. Was not knowingly initialed by Mr. Christian;
   i. Upon information and belief, bears forgeries of Mr. Christian's initials;
   j. Was not signed by Mrs. Christian;
   k. Was not knowingly signed by Mrs. Christian;
   l. Upon information and belief, bears a forgery of Mrs. Christian's signature;
   m. Was not initialed by Mrs. Christian;
   n. Was not knowingly initialed by Mrs. Christian;
   o. Upon information and belief, bears forgeries of Mrs. Christian's initials;
   p. Upon information and belief, was materially altered;
   q. Does not reflect the agreement of the parties;
   r. Was signed separate from the Note;
   s. Is endorsed by a a purported notary, name illegible, who falsely purports
      that the Deed was acknowledged before him or her on December 22, 2005.
   t. Was not acknowledged or signed in front of any notary by Mr. Christian;
   u. Was not acknowledged or signed in front of any notary by Mrs. Christian;
   v. Is not the Deed described in the purported Note dated December 22, 2005;
   w. Was not provided to plaintiffs at any time prior to the QWR1 Response.

**The Purported Customer Account Activity Statement (Exhibit M):**

   a. Failed to accurately account for all payments made on the account;
   b. Only accounts for payments from August 22, 2006 (payments began
      February 1, 2006);
   c. Reflects unlawful and unexplained payments and fees, including Property
      Inspection, Attorney advances, Corporate Advance Adjustment, and
      Forced placed insurance.

**THE OCTOBER 20, 2009 QWR PURSUANT TO RESPA**

240.    Mr. Christian, submitted a duplicate Qualified Written Request to ASC (identical to Mrs. Christian's June 2, 2009 QWR1) to further dispute the debt ("QWR2").

241.    The QWR2, requested the same information to validate the amount of the debt, and whether the interest and principal had been properly calculated and applied to the loan, among other information.

242.    ASC partially responded by letter dated October 29, 2009 to the QWR2. ("QWR2 Response")(Exhibit N).

243.    ASC's partial QWR2 Response was similarly incomplete, and failed to provide even the basic information requested.

244.    ASC advised in its QWR2 Response that even the basic information requested would not be provided "without a subpoena."

245.    Upon information and belief, ASC made representations to credit reporting agencies regarding plaintiffs' mortgage delinquency related to the Loan which were materially false.

246.    ASC knowingly, intentionally, and willfully violated RESPA by failing to provide a complete and accurate response to the QWR2.

247.    ASC maintains an ongoing unlawful pattern and practice of knowingly, intentionally, and willfully violating valid information requests under RESPA.

248.    Attached to the QWR2 Response were the following documents which ASC provided, and purported to be true copies of documents relative to the Loan:

      a.  The purported Settlement Statement (Exhibit D);
      b.  The purported HUD Addendum (Exhibit E);
      c.  Purported Uniform Residential Loan Application (Exhibit F);
      d.  Purported Uniform Underwriting and Transmittal Summary (Exhibit G);
      e.  Purported Federal Truth-in-lending Disclosure statement (Exhibit H);
      f.  Purported Good Faith Estimate at 6.75% Fixed (Exhibit I);
      g.  Purported Good Faith Estimate at 5.875% (Exhibit J);

      h. Purported Note (Exhibit K);

      i. Purported Deed of Trust (Exhibit L);

      j. Purported Customer account activity statement (Exhibit P);

            i. Failed to accurately account for all payments made on the account;

            ii. Only accounts for payments from November 6, 2006 (first payment was made February 1, 2006).

            iii. Reflects unlawful and unexplained payments and fees, including Property Inspection, Attorney advances, Corporate Advance Adjustment, and Forced placed insurance.

249.      The defendants provided the attached copies of the purported original Loan documents to plaintiffs and alleged them to be true copies. Plaintiffs deny that these are true copies of the authentic original Loan documents.

250.      Plaintiffs respectfully request this Court compel expedited production by the defendants of the purported original Loan documents.

251.      Plaintiffs demand strict proof of the authenticity of the document.

250.      As of October 2009, and through the present, ASC has flatly refused to lawfully respond to QWR2, refused to validate the plaintiffs' debt, answer the plaintiffs' concerns, or reveal the holder of the note.

251.      And while the threat of foreclosure is a real and present danger, the plaintiffs are intentionally, maliciously, and unlawfully kept in the dark as to who is the true party in interest.

252.      Plaintiffs have a right to access the foreclosure prevention servicing prescribed by the National Housing Act and under the Pooling and Servicing Agreement filed by the defendants with the Securities and Exchange Commission, which right is being denied to them by the defendants.

## STANDING

253.      Funds to finance the Loan were wired by the respective "funder" using wires and other instrumentalities of interstate commerce.

254.    MERS is the "nominee" or "beneficiary . . . (solely as nominee for Lender . . .)."

on the Loan.

255.    The Loan has been sold, re-sold, transferred, securitized, pooled and placed in

investment tranches, or have been otherwise assigned in the mortgage derivatives

256.    This action challenges, among other things:

    a.  The validity of the Loan transaction due to, among other conduct alleged, fraud, misrepresentation, and Mr. Christian's disabilities;

    b.  The lawful standing of any putative person or entity that claims to have the power to enforce through foreclosure, the default rights under plaintiffs' mortgage promissory note (and respective deed of trust) in any securitized mortgage, REMIC or securitization Special Purpose Vehicle ("SPV") or Conduit Loan scheme.

    c.  The issue of "standing" is a basic issue of Constitutional law. If you are not the person directly injured or directly benefiting from a specific law or circumstance you cannot go to court and try to enforce any rights that do not belong specifically to you.

    d.  The United States Supreme Court in several cases has stated that federal courts must satisfy for themselves that Standing exists and that "the plaintiff has alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction's Warth v. Seldin, 422 U.S. 490, 498-99 (1975). Thus, if no direct injury or direct harm exists as to the claimant that wishes to pursue a claim in court, then there is no right to "standing" or right to be in court in the first place.

    e.  The legality of failure to completely account for the aggregate costs of a transaction which purports to disclose a "yield spread premium" ("YSP") but yet entirely fails to include that YSP in the calculations applicable to the Truth in Lending Act Disclosures ("TILA Disclosures"). For the purposes of this Complaint, there are at least 2 YSP premiums that were not disclosed or accounted for in the calculations:

    f.  the YSP premium paid to the loan broker for origination of the loan; and

    g.  The YSP premiums received by the mortgage securitization pool creators, pool sponsors, and Ponzi scheme entities for originating the loan.

    h.  In this second YSP, the securitizing entities never disclosed or accounted for all the payments they received for structuring the transactions and placing the loan in the applicable pools in the first place.

    i.  This is even before any credit enhancements, pay-puts applicable to the securitized pool on an event of default for a class of certificates or an alleged loss of value percentage pay-out triggering mechanism.

    j.  This is a fact covered by the applicable securitized pooling and servicing agreement filed with the SEC, and is certifiable in an amount certain after discovery.

k.  The legality of failure to disclose the applicable "par value" of a loan transaction before the transaction is made or completed.

l.  The legality of the failure to properly account for, disclose, and calculate or list all the quantifiable reasons for the difference that exists between the YSP and the "par value" pricing of Mrs. Christian's loan; especially when she had excellent credit.

m.  The legality of whether a "pool" or "tranche" or "class of certificates" has been paid by its "loss of value insurer," or various "credit enhancement policies" may still foreclose on home in a double payment, triple payment, or even quadruple payment scheme.  Simply put, if the investments have been paid off or "bailed out" by their "securitized pool insurer or credit enhancement policy or guarantee" or by a "bail out federal government entity," are the putative investors still entitled to foreclose on consumers – who haven't had the same benefit of being "bailed out." If investors have been paid in full once, do they continue to have the right to get paid out yet again, if they already had required "loss reserves" insured against the possibility of default, and that even before a foreclosure is completed.  A foreclosure in this scenario, essentially offers a *third* payout on the exact same notes, pools, tranches or class of certificates in the securitized mortgage backed securities in which the note belongs. And, because of how the Internal Revenue Code is written (applied to these securitized Conduit Loan activities), these profits are potentially tax free to the pool owners or investors, or class of certificates, giving them yet a *fourth* source of profit distribution to the securitized mortgage pool.  Whether that fourth source of profit distribution ever reaches the mortgage pool investors is yet to be determined.  Considering the "bail out" payments and the totality of the circumstances, the defendants' behavior is not just egregious, unconscionable, arrogant, irresponsible and greedy – it is outright robbery and theft being perpetrated against Mrs. Christian, and the American taxpayer.

n.  The legality of whether the failure at settlement to disclose the Real Party in Interest of Certificate Holder(s) on a securitized loan transaction tolls the TILA statute of limitations.

o.  The legality of whether the failure at settlement to disclose the Real Party in Interest of Certificate Holder(s) on a securitized loan transaction tolls the RESPA § 6 or  § 8(a) statute of limitations.

p.  The legality of whether a mere putative "holder of the note" or worse, a mere straw "nominee" of a note holder, such as Defendant MERS in this Complaint, who is not a direct "legal or equitable beneficiary of payments of the Note," has the *standing* to enforce *any* provisions of the note, including the power to enforce the Note by foreclosure, especially when the original promissory note is lost.

q.  The legality of the one sided application of the 33 Act § 10 disclosures and SEC Rule 424(b)(5).  Specifically, the prospective pool issuer or sponsor of the REMIC pool or Conduit Loan must comply with the disclosure requirements of the 33 Act by filing a 424(b)(5) prospectus or private placement memorandum that warns prospective investors – *before they*

*purchase* – that certain loans in the proposed securitized mortgages pool possessing interest only loan characteristics present   *". . . a likelihood of default, especially in the early years. . ."* Yet, in violation of the 33 Act § 10 itself, plaintiffs were never warned or told – *before she "purchased"* – that the loan she was provided was likely to fail or default regardless of her high credit score, good intentions, and valiant efforts to pay the mortgage loan.  This failure to "enforce the warnings and disclosures" equally to the mortgage loan borrower is in direct contravention of 33 Act § 10 which states:

> In the exercise of its powers . . . the Commission shall have authority to. . . prescribe . . . the form and contents which i may find *appropriate* and *consistent with the public interest and the protection of the investors* [emphasis added]

257.    Providing plaintiffs with the same warning given to potential investors considering purchasing her Loan – *that their loan is likely to fail because of the nature and characteristics of the loan itself* - is appropriate and consistent with the public interest.

258.    These securitized mortgage pools were set up in a manner which allows them to function as racketeering activities in glorified pyramid and Ponzi schemes operating under the color of law. These deceitful, and underhanded activities generated (and continue to generate) payments that artificially inflated the cost of the plaintiffs' Loan and reaped for the defendants' substantial illegal, unconscionable, ongoing, and improper profits her expense. These violations ruined the Christian's credit, exhausted their savings, and created extraordinary emotional stress as they may likely be homeless at any moment because of their inability to pay the mortgage that defendants "set up" for them.

259.    The defendants created, developed, sold, and profited from their predatory and sub-prime toxic Loan provided to plaintiffs which was specifically designed to default. Defendants profited from **their defective** financial lending products and "services," without regard to the financial and emotional repercussions to the Christians.

44

260.     The defendants fraudulently conceal their activities, and in the securitized pool environment, conceal their identity.  By concealing their activities and using loan originators as fronts, defendants are able to shield themselves from claims for violations of consumer protection and other laws.

261.     Default is preferable to the defendants because they can profit more by foreclosing on a property.  Once the Loan goes into default, these savvy defendants cash in on their insurance and credit enhancement policies and in many cases get paid in full – 100% or more. Upon information and belief, profit considerations affect the defendants' lack of any real motivation to modify the plaintiffs' Loan.

262.     Faced with a modification request from plaintiffs, defendants were faced with the choice between whether to:

    a. modify the Loan, take a loss, and wait 30 years to recover a *reduced* income stream; or
    b. deny the modification, default the homeowner, and collect on insurance from AIG, MGIC, or similar counter-parties – and still acquire the home (and equity too.)

263.     The defendants chose to deny the plaintiffs' modification request.

264.     Then, when it seems another penny cannot be had, the defendants' racketeering and Ponzi schemes reward them with tax free pay-outs under the REMIC provisions in the IRS code.

265.     Because the defendants intentionally set the plaintiffs up to default, they ought to be held accountable and not hide behind loan brokers and other loan origination entities – many which no longer exist.

266.     Defendant SAMUEL I. WHITE, PC ("SIW"), the foreclosing law firm and trustee on the plaintiffs' Loan, had a fiduciary duty to both the purported Lender, Wells Fargo Home Mortgage – and to the plaintiffs – to be certain that Wells Fargo Home Mortgage was *in fact* a

bona fide "lender" (as required by the purported Deed of Trust and security instrument it relied on (the "Deed")), and that it had the power or authority to commence foreclosure proceedings.

267.     The "because we say so" assertion to "validate" purported "Lender" status should be insufficient to compel SIW take adverse action, but nonetheless in concert with its associates in the securitized mortgage pool or mortgage Ponzi scheme environment, the players did not comply with their fiduciary duties and took adverse action nonetheless.

268.     Further, the non-judicial foreclosure process in Virginia occurs without any documentary review whatsoever.  That the defendants profit immensely from their largely unchallenged participation in the foreclosure process is troubling.

269.     Specifically, the active participation of SIW provided these co-conspirators and aiders and abettors with hefty legal fees and revenues, and if the foreclosure action had concluded, commissions of 5% or more of the sales price.

270.     SIW is hardly ever challenged or questioned in court, regardless of the lack of documentation, inaccurate documentation, or even worse in this instant case, fraudulent documentation that was not verified – that was clearly and patently bogus on its face – yet was nonetheless relied upon by defendants to justify its specious claims that it actually had standing to attempt foreclosure on the Property.

271.     Once defendants successfully created one illegal Ponzi scheme and generated obscene profits from that activity, they began using their ill gotten gains in other securitized mortgage pools, thereby essentially using their illegal profits in money laundering activities.  The higher the profits, the more pools created, and the more money laundered.

### THE MORTGAGE POOLS

272.     In 2005, plaintiffs were repeatedly solicited by RM-FFC to join several mortgage pools (i.e. take a loan against the Property).

273.    Mr. Midgette and RM-FFC and its agents were the first line of agents and recruitment associates specifically tasked to fill the securitized mortgage pools which the pool sponsors, originators, gamblers, and Ponzi scheme sponsors created, and to continuously fill the applicable mortgage pools, REMICs or SPVs.

274.    Upon information and belief, Mr. Midgett, RM-FFC agents and REIPA agents normally, readily, and regularly communicate with each other via cellular phones, faxes, internet and other forms of electronic communication and facilities of interstate commerce throughout to generate the plaintiffs' Loan simultaneously with other borrowers loans to start filling the securitized mortgage pools that defendants RM-FFC and REIPA were tasked to fill by defendants FULTON FINANCIAL, RB-FFC, WELLS FARGO, and USBNA throughout the mortgage loan, ponzi schemes that created and filled the mortgage pools which are the subject of this Complaint.

275.    Once initial telephone contact was made with the defendants, Mrs. Christian (a) filled out a loan application; (b) provided her social security number to obtain her credit report and credit or FICO ratings; (c) submitted accurate and readily verifiable income and bank account documentation; and (d) ultimately applied for a mortgage loan with Defendant

276.    Upon information and belief, defendants Mr. Midgett, RB-FFC, WELLS FARGO, USBNA, MERS, RM-FFC, and REIPA knew before the settlement on the plaintiffs' Loan that her Loan was to be "securitized," but nonetheless fraudulently concealed and never disclosed such activity to her, thereby never actually complying with any applicable CRESPA, TILA, RESPA, and HOEPA disclosures.

277.    Defendant MERS is identified on the deed of trust not as a Trustee, but as "a separate corporation that is acting solely as a nominee for Lender."

278.    At all times relevant hereto, in the course of their contact with the defendants, plaintiffs did obtain a mortgage loan through defendants Mr. Midgett and RM-FFC.

279.    Alternatively, all times relevant hereto, in the course of her contact with the defendants, plaintiffs did obtain a mortgage loan through defendants Mr. Midgett and RM-FFC.

280.    Mr. Midgett and RM-FFC, and its employees, officers and agents performed is activities and duties as the first link of the chain in a convoluted, obfuscating, and yet extremely profitable Ponzi scheme the other defendants co-created and used to perpetrate the violations asserted in this Complaint against the unwitting plaintiffs.

281.    Making use of instrumentalities of interstate commerce, and as a normal course of dealing and business practices, defendants RB-FFC, WELLS FARGO, USBNA, RM-FFC, and REIPA normally and regularly wired the Loan proceeds on the loans they table funded for the borrowers, including plaintiffs, who was recruited RM-FFC.  Upon information and belief, the proceeds for the plaintiffs' loan were wired to REIPA by defendant RB-FFC.

282.    The identity of the true party in interest and ultimate "Lender" for the plaintiffs' Loan is unknown at this time.

283.    Upon information and belief, after the settlement of the plaintiffs' Loan,  RM-FFC subsequently transferred the Loan to WELLS FARGO to be more properly placed in WELLS FARGO's applicable securitized mortgage REMIC or SPV pools. On information and belief, defendants knew prior to the settlement that her loan was to be assigned and "securitized", but nonetheless fraudulently concealed that information and never disclosed it to plaintiffs, thereby never actually complying with applicable TILA, RESPA, HOEPA, and CRESPA disclosures..

284.    Upon information and belief and at all times relevant to these proceedings, Defendant's residential lending business model consisted of making as many residential loans and/or loans to as many unwitting borrowers as possible.

285.    RM-FFM conducted its business as a wholesale lender/broker as a wholly owned subsidiary of FULTON FINANCIAL until it ceased operations in 2007.  In its capacity as

mortgage broker, it worked pursuant to correspondent Loan agreement relationships and/or lending contracts with defendants RB-FFC, WELLS FARGO, USBNA, and worked closely with RB-FFC, WELLS FARGO, and USBNA sales representatives, followed their lending guidelines, and originating loans that were ultimately supposedly underwritten and reviewed for borrower quality control by RM-FFC, WELLS FARGO, and USBNA. No borrower quality control was conducted.

286.     Prior to 2008, Fulton Financial originated and sold residential mortgages through its former Resource Bank affiliate, which merged into its Fulton Financial Bank subsidiary in the first quarter of 2008.

287.     FULTON operated a significant national wholesale mortgage lending operation from the time it acquired Resource Bank in 2004 through early 2007, through its Resource Mortgage division.

288.     From 2004-2007, through its Resource Mortgage Division, FULTON originated and sold significant volumes of non-prime loans without regard to a borrower's ability to repay, and with little or no verification of borrower qualifications, such as income or assets.

289.     Significant volumes of non-prime loans were originated and sold. Total loans sold by defendants in 2007 and 2006 were $769.5 million and $1.4 billion, respectively.[1]

290.     Beginning in 2007, FULTON experienced an increase in requests from secondary market purchasers to repurchase non-prime loans sold to those investors through its Resource Mortgage Division. These repurchase requests resulted in FULTON recording approximately $2.3 million and approximately $25.1 million of charges during 2008 and 2007, respectively.

---

[1]        Fulton Financial Corporation FORM 10-K ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934, For the fiscal year ended December 31, 2008 , pg. 88

291.    Upon information and belief, certain of these requests to repurchase non-prime loans were in part based on allegations that FULTON intentionally and materially misrepresented borrower information, and/or assisted borrowers in misrepresenting their information.

292.    FULTON could originate a non-prime loan – and earn commission, fees, and undisclosed kick backs – no matter the true financial situation of the borrower.

293.    As of December 31, 2008, on loans it originated then sold through its Resource Mortgage Division, FULTON admitted additional potential **misrepresentations of borrower information** existed on approximately **$16.6 million** worth of loans in 2007, and approximately $7.9 million worth of loans in 2008.

294.    Nearly half of the approximately $24.6 million in loans affected by borrower information misrepresentations - - approximately $10.39 million - - is classified as reserved/write down on defendant's books for anticipated losses.

295.    During 2008, FULTON paid approximately $9.1 million to secondary market investors to settle outstanding repurchase requests and other potential claims, to reduce its exposure to previously loans sold through its Resource Mortgage Division, totaling approximately $22.1 million in principal.

296.    In January 2008, FULTON stopped accepting any loans through its Resource Mortgage national wholesale lending operation.

297.    Sometime prior to 2008, WELLS FARGO informed plaintiffs that it would be servicing her Loan and payments should be made to WELLS FARGO.

298.    Plaintiffs did not receive any correspondence from RB-FFC, RM-FFC or MERS as required by contract and law that they had assigned, transferred, or sold her Loan and any of their interest in her home Wells Fargo Home Mortgage.

299.     At all times relevant hereto, RB-FFC, WELLS FARGO, USBNA, RM-FFC

regularly extended or offered to extend consumer credit for which a finance charge is or may be

imposed or which, by written agreement, is payable in more than four installments thereby not

exempting them from coverage of federal and state consumer protection laws.

300.     RB-FFC, WELLS FARGO, USBNA, RM-FFC are the persons/entities to whom

some of the transactions which are the subject of this action is initially payable, making this

defendant a creditor within the meaning of TILA, 15 U.S.C. 1602(f) and Regulation Z 226.2(a)

(17). Despite *a priori* knowing that the plaintiffs' Loan formed part of a securitized mortgage

Loan transaction, RB-FFC, WELLS FARGO, USBNA, and RM-FFC concealed and failed at all

times relevant hereto to disclose the identity of the true persons in interest or true lender of the

plaintiffs' note.  To this date proper disclosures have not been made, and disclosure of the true

party in interest, which would comply with Rule 17 of the Fed. R. Civ. P., is still unknown.

301.     Having never identified and fraudulently concealed the identity of other referral

entities, including the indent(ies) of the true party(ies) in interest, RB-FFC, WELLS FARGO,

USBNA, and RM-FFC have never properly complied with the applicable TILA, RESPA,

HOEPA, and CRESPA disclosures.

302.     Upon information and belief RB-FFC, WELLS FARGO, USBNA, and RM-FFC

either invested in the classes of certificates of the applicable securitized REMIC or SPV, or sold a

majority of their residential loans to the secondary market, that is, to innumerable third-party

investors or qualifying SPV or REMIC entities that issue interest-bearing classes of certificates

representing the mortgage pool notes and the hyped interest revenue stream.  The YSPs and other

consideration applicable to these notes, and the plaintiffs' Loan and received by the securitizing

entities have yet to be disclosed.  Thus, as of the filing of this Complaint, the proper disclosures

have not been made.

51

303.    After bundling or selling the mortgage notes, including the plaintiffs' Loan, to securitization entities or to third party investors, some defendants (like RM-FFC and WELLS FARGO) typically were/are required to repurchase those loans in certain circumstances, for instance, in the event of documentation errors, underwriting errors, fraud, or early loan payment events. To date the proper Purchase and Sale Agreement ("PSA") as filed with the SEC has not been made available to plaintiffs – despite Qualified Written Requests – to cite the exact SEC record number or PSA page number where those provisions are found on her loan.

304.    The applicable credit enhancement policies and amounts are addressed in the relevant PSA.

305.    Another issue of federal court "standing" doctrine is that where a pay-out has already taken place, even if it is from a third party payor, standing no longer exists since no harm or injury can still be demonstrated by the supposedly injured party. As such, putting aside any applicable federal government bail outs already received by RB-FFC, WELLS FARGO, USBNA, and RM-FFC, the very issue of whether they can establish any scintilla of financial injury or any harm is at issue in this Complaint.

306.    A proper accounting of the amount received from credit default swaps and other credit enhancements, the identity of the counter parties, and the pay-out mechanisms already in place in the applicable PSA will reveal double, triple, quadruple or more pay-outs on the plaintiffs' note.

307.    The multiple payments on the applicable securitized mortgage trusts bring into question any Defendant's ability to establish "standing" in the plaintiffs' alleged note default and its ability to enforce any note default provisions it may have.

308.    While RB-FFC, WELLS FARGO, USBNA, and RM-FFC claimed to maintain underwriting guidelines that properly assessed the ability of plaintiffs to repay their debt,

defendants purposely relaxed their underwriting guidelines and provided and sold a risky loan to them to increase their loan originating volume and their profits.

309.    Since the emphasis was on volume, regardless of borrower's ability to pay – much less re-pay – the loan, Defendant's underwriting standards became so lax that their own underwriters took no steps (or no meaningful steps) to determine whether plaintiffs could actually pay – much less re-pay – a loan because they wanted to fill the securitized pools as quickly as possible.

310.    Further, defendants' activities sought to fund higher loan volumes with higher loan limits, obtain higher leveraged returns, and thereby obtain much higher profits for themselves and the REMIC investors and securitized pool participants (again undisclosed or accounted YSPs).

311.    The higher the appraised property value obtained from real estate appraisers that were also co-opted into the scheme, the higher the potential loan amounts given to the selected borrowers, and the higher the commissions procured.  The higher the loan volume generated, regardless of the loan amount, the higher the amount of fees paid to of collected by MERS and the higher the amount lost by the County land records office.

312.    Defendants violated and ignored the law by failing to clearly and conspicuously disclose to plaintiffs key provisions of their mortgage, including but not limited to such details as the specific loan terms and the total real dollar amount the mortgage would cost her over time.

313.    Defendants violated and ignored the law by failing to clearly and conspicuously disclose to plaintiffs the identity of the real parties having an interest in the purported Note (TILA disclosure violations), or the identities of those individuals or entities that receive commissions, referrals, kickbacks, fee-splits, and YSP payments without the proper disclosures required by RESPA.